**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|                                                    |   |                                   |
|----------------------------------------------------|---|-----------------------------------|
| **IN THE MATTER OF THE**                           | ) |                                   |
| **COMPLAINT**                                      | ) |                                   |
|                                                    | ) |                                   |
| **OF**                                             | ) |                                   |
|                                                    | ) |                                   |
| **PETER KNUDSEN A/S, Owner of the**                | ) | **CIVIL ACTION NO. 08-00505-CG-B** |
| **M/V VINLAND SAGA (IMO No.**                      | ) |                                   |
| **812649) for Exoneration from or**                | ) |                                   |
| **Limitation of Liability**                        | ) |                                   |

**MEMORANDUM OPINION AND ORDER**

On June 10, 2007, J. Gregory Carwie, Esquire ("Carwie"), as conservator for Emil Harris ("Harris"), brought a lawsuit in state court against Peter Knudsen A/S ("Knudsen"), Janus Anderson, and Harrison Brothers Drydock & Repair Yard, Inc. ("Harrison Brothers") for injuries he allegedly incurred while working at Harrison Brothers' shipyard on board the M/V Vinland SAGA. On August 29, 2008, limitation plaintiff Knudsen filed a complaint in this court for exoneration from or limitation of liability in Carwie's lawsuit because, at the time of the accident, he was the owner of the M/V Vinland SAGA. (Doc. 1). On October 21, 2008, Carwie filed an answer to Knudsen's complaint and filed a claim against Knudsen for negligence. (Doc. 12). Harrison Brothers also filed an answer to Knudsen's complaint and also asserted its own claims against the limitation plaintiff. (Doc. 18). Knudsen thereafter filed an answer to Harrison Brothers' claims and filed a counterclaim against Harrison Brothers asserting that he is owed full indemnity or contribution from Harrison Brothers. (Doc. 20). On December 5, 2009, Harrison Brothers filed its answer to the limitation plaintiff's counterclaim arguing in part that it is "immune from tort liability, such as is made the basis of Limitation Plaintiff's Counterclaims,

pursuant to the provisions of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. 901 et. seq., including but not exclusively Section 904 and Section 905 of said Act" and also that "it is immune from tort liability... pursuant to the 'borrowed employee' and 'borrowing employer' doctrines."  (Doc. 21, p.3).  On March 30, 2009, Harrison Brothers filed a crossclaim against Carwie seeking declaratory judgment asserting the same two arguments above.  (Doc. 45).  This matter is now before the court on (1) Harrison Brothers' motion for summary judgment (Docs. 54), Carwie's response (Doc. 61), Knudsen's response (Docs. 64-66), and Harrison Brothers' replies (Docs. 23 & 70); (2) Carwie's motion for summary judgment (Doc. 134), Knudsen's responses (Docs. 142 & 146), and Carwie's reply (Doc. 149); and (3) Knudsen's motion for summary judgment (Doc. 136), Carwie's response (Doc. 145), and Knudsen's reply (Doc. 150).  For the reasons stated below, Harrison Brothers' motion for summary judgment is due to be granted, Carwie's motion for summary judgment is due to be denied, and Knudsen's motion for summary judgement is due to be denied in part and granted in part.

## FACTS

Harris, a pipefitter by trade, alleges that he was injured on September 28, 2006, when he fell while traversing a platform or walkway in one of the cargo holds of the M/V Vinland SAGA. (Doc. 12, ¶ 4).  Subsequent to the alleged incident, Harris filed a claim for and has received workman's compensation benefits under the LHWCA.  (See Doc. 14).  At all times relevant hereto, Knudsen, a Danish corporation, owned the M/V Vinland SAGA, which is a Danish general cargo vessel.  (Doc. 134-1, Knudsen Aff., p. 2).  This vessel has two working cargo holds, Number One Hold forward and Number Two Hold aft, which were separated into two

decks, a lower hold and a "tween deck."  In order to enter Number One Hold from the weather

deck/main deck, access must be made through an opening on the main/weather deck.. (Doc. 134-

6, Alexander Dep., p. 2; Doc. 134-43, pp. 3-4; Doc. 142, p. 2).  In order to travel from the

main/weather deck to the bottom of the cargo hold, a person would need to descend an access

ladder via a small opening or hatch cover on the main deck  (Doc. 137-10, Hartley Dep., pp. 7-

13; Doc. 137-8, Haig Dep., pp. 10-12).  The ladder from the main deck stopped at the "tween

deck" which consisted of a ledge or "catwalk" running around the perimeter of the hold.  (Doc.

137-10, Hartley Dep., pp. 9-10).  The "tween deck" was approximately seven feet from the

bottom (tank top) of the hold and about four feet wide.  (Doc. 134-7, Alexander Dep., p. 2; Doc.

137-8, Haig Dep., p 36).  The "tween deck" was comprised of metal plates which could be

opened to allow full use of the cargo hold, i.e. from the bottom of the cargo hold (sometimes

referred to as the "tank top") all the way to the main hatch covers on the weather deck/main

deck.  If the "tween deck's" floor plates were removed, the ledge or catwalk was open to the

bottom of the cargo hold or tank top.  (Doc. 137-3, Andreassen Dep., pp. 5-9).  After climbing

down the access ladder from the main deck to the "tween deck", a person would have to walk a

few feet forward and descend a second ladder to the bottom or tank top.  (Doc. 137-10, Hartley

Dep., pp. 8-13; Doc. 137-8, Haig Dep., pp. 9-11).

　　　　In early March 2006, the Vinland SAGA loaded a cargo of heavy anchor chains in

Bilbao, Spain.  (Doc. 137-3, Andreassen Dep., pp. 3-4; Doc. 137-6, Sorenson Dep. (Vol. 1), p.

3).  When the anchor chain was loaded in Bilbao, the "tween decks" were open allowing the

chain to fill up most of the cargo hold.  (Doc. 137-6, Sorenson Dep. (Vol. 1), pp. 5-9; Doc. 137,

Sorenson Dep. (Vol. 2), pp. 3-4).  John Sorenson and Captain Hovgaard were the captains and

John Andreassen was the Chief Engineer aboard the vessel during the voyage from Bilbao. (Doc. 137, p. 4, n. 4 & 7). Captain Sorenson testified that the crew put lashings to secure the "tween deck" plates in place prior to the sea voyage from Bilbao to the United States. (Doc. 137-7, Sorenson Dep. (Vol. 2), pp. 3-4). In route to Port Forchon, the Vinland SAGA suffered a breakdown in its propulsion system near the Bahamas. (Doc. 137-6, Sorenson Dep. (Vol. 1), pp. 3-4). After being towed several times, the vessel ultimately arrived in Mobile, Alabama. (Doc. 137-2, Lyborg Dep., pp. 4-8; Doc. 137-3, Lyborg Dep., pp. 10-11).

Janus Andersen, the technical manager of the vessel who was engaged by the owner Knudsen, arranged for repair work to be done by Harrison Brothers and signed the August 16, 2006, "time and materials" contract with the shipyard. (Doc. 134-2; Doc. 134-43, p. 2; Doc. 137-2, Doc. 142, p. 1). William Harrison ("Harrison") was and is the president of Harrison Brothers, (Doc. 54-3, Harrison Aff., ¶ 1) and Mark Tate ("Tate") is "his number two man." (Doc. 54-4, Haig Aff. ¶ 6). Job Crafters, Inc. ("Job Crafters") furnishes "leased employees to clients, primarily shipyards in the Mobile, Alabama, area such as Harrison Brothers." (Doc. 54-2, Murphy Aff., ¶ 6).[1] Whenever Harrison Brothers needed additional employees to complete work at its shipyard, "Harrison Brothers would request Job Crafters to furnish contract or leased workers to Harrison Brothers." (Doc. 54-3, Harrison Aff., ¶ 3). After furnishing these leased workers, Job Crafters did not control any operational matters at a client's shipyard..(Doc. 54-2, Murphy Aff., ¶ 6).

Harrison Brothers and Job Crafters entered into an agreement for Job Crafters to lease

---

[1] Between August 2006 and December 2007, Troy Murphy was the general manager of Job Crafters.

employees to Harrison Brothers for the period June 2005 through June 2006 ("2005-2006

Contract"). (See Doc. 54-1). The 2005-2006 Contract expired on its terms in June 2006, and

Harrison Brothers did not provide a contract for the period of June 2006 through June 2007.

However, "both parties continued to operate under the terms of the 2005-2006 Contract." (Doc.

54-3, Harrison Aff., ¶ 3; Doc. 54-2, Murphy Aff. ¶ 3). Pursuant to the 2005-2006 Contract, Job

Crafters agreed to "provide temporary labor to the client," maintain "payroll administration of

the temporary employees [which] includes payroll and employers tax", and preserve "workers

compensation insurance." Furthermore, the contract provided that the leased employees would

work under the direction of Harrison Brothers' supervision, but also stated that Harrison

Brothers "agrees that all persons sent to them under the terms of this Agreement will be treated

as employees of [Job Crafters]." (Doc. 54-3, Harrison Aff., Ex. A). Harrison Brothers paid Job

Crafters a fixed rate for each hour worked by the leased employees,[2] (Doc. 54-2, Murphy Aff., ¶

12), and Harrison Brothers had the sole power "to accept, retain, lay off or discharge any of the

leased employees, in so far as work at its yard was concerned." (Doc. 54-3 Aff., ¶ 4).

    Prior to working on the Vinland SAGA, Harris had worked at the Norfolk Naval

---

[2] As explained by Troy Murphy,

For its services, Job Crafters was paid by Harrison Brothers on the basis of a labor rate
set for each leased employee and on the basis of actual hours worked, both straight time
and overtime. While the [2005-2006 Contract] referred to payment on a "time and
material" basis, Job Crafters actually provided no materials. Harrison Brothers'
payments were based solely on the number of hours worked by the leased employees
during a given period of time. The rate charged by Job Crafters for each leased employee
was determined by a base rate derived from Job Crafters' expense per employee with a
margin added on top of that for Job Crafters' overhead and profit.

Murphy Aff., ¶ 10.

Shipyard and Newport News Shipyard in Virginia; for Bender Shipbuilding in Mobile, Alabama, for approximately three years; at the shipyards in New Orleans, Louisiana, through Onyx Industries, a contract labor provider; as a pipefitter at civilian shipyards in San Diego through Job Crafters, as well as Ingalls/Northrop Grumman in Pascagoula through Job Crafters. (See Doc. 137-9, Harris Dep.). On June 21, 2006, Harris submitted an application with Job Crafters. (Doc. 54-1, Harris Dep., Ex. 1 & pp. 23-24). He was thereafter assigned to work at Harrison Brothers. (Id., pp. 23-24). While working at Harrison Brothers, Harris thought he worked under the supervision and control of Harrison Brothers' management. (Id., pp. 24, 26, 43, 45-47, 51). Harris was paid by Job Crafters for his work at Harrison Brothers, (Doc. 61, Ex. G; Ex. B, Harris Dep. p. 233), but Harrison Brothers provided the funds from which Harris was paid, and the wage Harris received was based on time records maintained and verified by Harrison Brothers. (Doc. 54-2, Murphy Aff. ¶¶10 & 12; Doc. 54-4., ¶ 11). After reporting to work, Harris's only contact with Job Crafters was picking up his weekly paycheck and occasionally "check in at some time to see if there any more work going on." (Doc. 54-1, Harris Dep., pp. 30-31).[3] In explaining his relationship to Job Crafters and Harrison Brothers, Harris compared himself to a "rental car" in that "the yard rents me from Job Crafters." (Id., pp. 31-32). While working at the Harrison Brothers' shipyard, Harris mostly used his own equipment but also used some supplies provided by Harrison Brothers. (Id., pp. 39-40). Job Crafters did not provide any equipment, supplies, materials or safety gear to any leased employee. (Doc. 54-2, Murphy Aff. ¶ 6). Harris accepted and liked this employment situation and did not object to working at Harrison Brothers.

---

[3] Job Crafters never requested Harris to perform a physical or drug test. Instead, that was the particular yard's responsibility. (Id., pp. 95, 98).

(Doc. 54-1, Harris Dep. pp. 35-36, 38-39).

Harris's immediate foreman and supervisor was Michael Haig ("Haig"). Haig was employed by Job Crafters and worked at Harrison Brothers as a leased employee. Haig, however, thought of himself "as being employed by Harrison Brothers and working for Harrison Brothers." (Doc. 54-4, Haig Aff., ¶¶ 3 & 4). Tate and Harrison would tell all the leased employees, including Haig and Harris, "what projects [they] were assigned to and what work [they] were to do and how [they] were to do it." Tate and Harrison also "were the ones who decided how many workers would be needed and were assigned to a particular project or work." Occasionally, Haig would offer suggestions, but "it was always in the end done the way [Tate or Harrison] instructed us." (Id., ¶¶ 7-8). Haig would also discuss with Tate and Harrison whether overtime was needed for a particular project, but he contends that the ultimate decision lay with Tate and Harrison. (Id., ¶9). Furthermore, Haig conducted safety meetings approximately once a week and prepared times sheets for the workers under him. All related papers were thereafter given to Harrison Brothers. (Id., ¶ 11).

When Haig was not present at the work site, Jason Russell ("Russell") was Harris's supervisor. (Id., ¶¶ 3 & 4). Russell was an employee of Job Crafters, yet he also thought of himself as "being employed by Harrison Brothers, although [he] knew that [he was] staffed through Job Crafters." (Doc. 54-5, Russell Aff. ¶¶ 3 & 6). Russell received his instructions from Tate, and he never received any guidance from anyone from the Job Crafters office "with regards to such matters as to our work hours and times, what work we are to do at Harrison Brothers and how we do the work." (Id., ¶¶ 8-9). On the date of Harris's alleged accident, Russell was the acting supervisor. (Id., ¶ 5).

The Vinland SAGA arrived at Harrison Brothers' shipyard in Mobile, Alabama, on or about August 21, 2006. (Doc. 137-10, Hartley Dep., pp. 3-4; Doc. 137-8, Haig Dep., pp. 4-5). It was then moved to a floating drydock on August 30, 2006. (Doc. 137-10, Hartley Dep., p. 5). Haig testified that a detailed inspection of the vessel was carried out by Harrison Brothers' personnel and the ship's officers to survey the work to be completed in the holds of the vessel and also to identify any hazards or problems which its workers might encounter on the vessel. (Doc. 137-8, Haig Dep., pp. 6-7, 14, 42-43). During that initial inspection, the "tween deck" was allegedly open with the metal floor plates stacked at the ends of the cargo holds. (Doc. 137-10, Hartley Dep., pp. 13-15, 19-21; Doc. 130-8, Haig Dep., pp. 8-9). Haig testified that he was concerned about the open "tween deck", a potential hazard which he identified when he climbed down the ladder the first time on August 31, 2006. Haig thought that some sort of barrier should be installed at the base of the ladder adjacent to the cargo hold but he did not install any such barrier at that time nor did he discuss his thoughts with the ship's crew or ask if the ship had anything that could be used for this purpose. (Doc. 137-8, Haig Dep. 16-17, 23, 27-33). The ship's crew did not alert Haig of any hazards or otherwise in relation to the vessel. (Doc. 145-7, p. 2).

While the ship was drydocked, the ship's crew remained onboard the vessel. (Doc. 142, ¶ 5). Haig testified that the ship's crew and the shipyard workers were doing separate tasks in relation to the vessel. (Doc. 145-6, Haig Dep., p. 2). The interaction between the ship's crew and the shipyard workers, however, is in dispute. Haig testified that the chief engineer, who was Haig's contact with the ship's crew, "directed us in our work" and told "us what we were to do and what time frame they wanted items done and started and completed and such" (Doc. 145-7,

Haig Dep., pp. 2-3) and that the crew "maintained control of the whole vessel." (Doc. 145-10, Haig Dep., p. 2). Furthermore, Haig testified that the shipyard workers were having "issues with [the vessel's crew] moving our equipment and moving the hatches." (Doc. 149-1, Haig Dep., pp. 2-3). On the other hand, Haig testified that the ship's crew worked "side by side in the same space" but that they never assisted the shipyard with any of the tasks that the shipyard was assigned or contracted to complete. (Doc. 137-8, Haig. Dep., p. 26). Captain Sorenson testified that his crew were not working together with the other workers and that he had authority over his crew when they were in the cargo hold. (Doc. 137-6, Sorenson Dep., p. 5). Captain Hovgaard testified that the ship's crew "had control of their own work during the operation in the cargo hold" and when asked "for their own work, they would have had control of the ladder and the "tween deck" ledge and the ladder going from the "tween deck" down to the tank top cover, correct" to which he responded "[y]eah, that's correct." (Doc. 134-4, Hovgaard Dep., p. 2).

On September 28, 2006, Harris fell from the "tween deck" to the bottom (tank top) and was injured. (Doc. 137-11, Russell Dep., p. 21). Although he was unsure of the exact date, Haig was "pretty sure" he put up a rope around the ladder, but that "it was put up and took down and put up and took down repeatedly." (Doc. 134-10, Haig Dep., p. 2). When asked if he though that he put up the rope before Harris got hurt, Haig stated "I'm pretty sure I did, yes, sir." (Doc. 145-11, Haig Dep., p. 3). Chains were also placed around the ladder at some point prior to Mr. Harris's accident, but the ropes and chains would be taken down if "the crew was working in the area" and if "they needed access to get through there." (Doc. 134-11, Russell Dep., p. 2). Russell also testified that he remembered "the chains being up" and that "[t]here was also ropes up at one time" and that [i]f the crew was working in the area, then, yes, they would take them

down if they needed access to get through there." (Doc. 145-15, Russell Dep., p. 2). There is no evidence, however, of the ropes or chains being up and removed on the day of the accident. (See Doc. 137-8, Haig Dep., pp. 38-39; Doc. 137-11, Russell Dep., pp. 19-21; Doc. 137-12, Preston Dep., pp. 6-7), but there were no chains or stanchions installed at the time of Mr. Harris's accident. (Doc. 134-9, Davis Dep., p. 2). After the accident, Russell installed the chains around the ladder because "they had taken them down." (Doc. 137-11, Russell Dep., p. 22). Haig also testified that he requested that the ship's crew stack hatch covers in the hold in such a position that it would protect against falls from the "tween deck". He testified that the crew "did it for awhile but then they always had to move the hatches to do their work." (Doc. 145-10, Haig Dep., pp. 2-3). Haig testified that these covers would "never stay[] in one place" and that "[y]ou never knew where they were going to be when you came in in the morning. They would not leave them in one place." (Doc. 145-11, Haig Dep., p. 2). The movement of these stack covers was accomplished by the ship's equipment that could only be operated by the ship's crew. (Doc. 145-10, Haig Dep., pp. 2-3).

On the day of the accident, Harris was instructed to finish removing the fire line piping from the Vinland SAGA. This work required Harris to go from the main/weather deck to the bottom (tank top) of the Number One Hold. (Doc. 137-11, Russell Dep., p. 9). Harris did not voice any concerns to Russell about working on the Vinland SAGA. (Id., p. 10). Russell testified that he did not receive any reports that there were any hazardous conditions on the vessel. (Id., p. 11). After receiving his assignment, Harris proceeded to the Number One Hold for the first time. He testified that he "did know one thing when I was going down there, that I wasn't comfortable with it. It wasn't no light. It was dark." (Doc. 137-9, Harris Dep., p. 18).

Harris had a flashlight in his tool bag, and anticipating using the flashlight once he got "there on the job", he did not use the flashlight prior to his accident. (Id., p. 23). Harris did not alert Harrison Brothers or any of his supervisors of "any unsafe condition that you saw on this ship, dark smoke, no chains, anything like that". (Id., p. 20). Harris further testified that it was "[t]oo dark to be in there. There should have been more light", and when asked if he could see from the weather deck to the "tween deck" platform, Mr. Harris testified he could not. (Id., p. 224). Harris stated that once he got on the "tween deck", another person was coming down the ladder, thus he moved to give the other person some room, an action which caused him to fall to the tank top. When asked why he fell, he testified that "I guess the platform wasn't as big as it was supposed to have been" but stated he did not trip on anything. (Id., p. 127). Wesley Alexander, a welder, was assigned to work with Harris on the day of the accident and the person who was following Harris down the ladder. Alexander also testified that there was "[n]ot much light... mainly only light I remember is coming through the access hole." (Doc. 137-14, Alexander Dep., pp. 3-7).

## LEGAL ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere

existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" <u>Bailey v. Allgas, Inc.</u>, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting <u>Anderson</u>, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, at 249-250. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>See</u> <u>Anderson</u>, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. <u>O'Ferrell v. United States</u>, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." <u>Miranda v. B&B Cash Grocery Store, Inc.</u>, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing <u>Mercantile Bank & Trust v. Fidelity & Deposit Co.</u>, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." <u>Howard v. BP Oil Company</u>, 32 F.3d 520, 524 (11th Cir. 1994)(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material

issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e) "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

### B. Immunity under the LHWCA and Borrowed Employee Status - Harrison Brothers' Motion for Summary Judgment (Doc. 54)

Harris is a longshoreman and is being paid benefits under the LHWCA, thus the LHWCA provides tort immunity for his employer:

(a) The liability of an employer [for compensation benefits] shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, defendants, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employee or his legal representative in case death results from injury may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damage on account of such injury or death...

(b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.

13

33 U.S.C. § 905(a) & (b).

Even though Harris was technically an employee of Job Crafters, Harrison Brothers contends that this immunity can extend to Harrison Brothers since it borrowed Harris from Job Crafters thus effectively becoming Harris's employer.[4] The Fifth Circuit Court of Appeals, in <u>Ruiz v. Shell</u>, 413 F.2d 310 (5th Cir. 1969), discussed the "borrowed servant" doctrine and identified nine factors to consider when determining whether LHWCA tort immunity is extended in cases where an employer borrows an employee of another employer:

(1) who has control over the employee and the work he is performing;

(2) whose work is being performed;

(3) whether there is an agreement between the original and borrowed employers;

(4) whether the employee acquiesces to the new work situation;

(5) whether there was a temporary termination by the general employer of the relationship with the "servant";

(6) who provides the instruments and place for performance of the work;

(7) whether the employment of the "servant" is for a considerable length of time;

(8) who had the right to discharge the employee; and

(9) who had the obligation to pay the employee.

<u>Id.</u> at 312-13.

---

[4] Knudsen argues that the 1984 amendments to the LHWCA, Pub.L.No. 98-426, 98 Stat. 1639, 1641 (1984), eliminated the concept of a borrowed employee in LHWCA jurisprudence. For the reasons stated in <u>West v. Kerr-McGee Corp.</u>, 765 F.2d 526, 528-530 (5th Cir. 1985), this court holds that the 1984 amendments did not affect the established "borrowed employee" analysis. <u>See also</u> <u>Peter v. Hess Oil Virgin Islands Corp.</u>, 903 F.2d 935, 940- 941 (3d Cir. 1990)(adopted the <u>West</u> analysis); <u>Melancon v. Amoco Prod. Co.</u>, 834 F.2d 1238, 1246-47 (5th Cir. 1988)(same).

The court explained that these factors have been given great weight, though "no one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship..." Id. at 312.

Generally, the question of borrowed employee status is a question of law for the court to determine. Billizon v. Conoco, Inc., 993 F.2d 104, 105 (5th Cir. 1993) reh'g denied 3 F.3d 441 (5th Cir. 1993). In some cases, however, factual disputes must be resolved before the district court can make a legal determination. Id. (citing Brown v. Union Oil Co. of Cal., 984 F.2d 674, 679 (5th Cir. 1993); Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1245 n.13 (5th Cir. 1988)) reh'g granted on other grounds, 841 F.2d 572 (5th Cir. 1988). The limitation plaintiff and Carwie "cannot generate a factual dispute merely by contesting the conclusions reached by the court, rather they must show that genuine disputes exist over enough determinative factual ingredients to make a difference in this result." If sufficient ingredients are undisputed, the court may grant summary judgment. Gaudet v. Exxon Corp., 562 F.2d 351, 358-59 (5th Cir. 1977). This court finds no genuine issue as to any of the facts concerning the below factors; therefore, the question before this court is whether Harris was a borrowed employee as a matter of law.

### 1. Control Over the Employee

The Court in Ruiz explained that "[t]he factor of control is perhaps the most universally accepted standard for establishing an employer-employee relationship." Ruiz at 312 . In general, "an employee is considered 'borrowed' when his general employer gives up control to the borrowing employer." Izaguirre v. C&C Marine and Repair, L.L.C., slip op., 2009 WL 2488263, at *2 (E.D. La. Aug. 11, 2009)(citation omitted). It is clear from Harris's deposition testimony that while at Harrison Brothers, he thought he worked under the control of Harrison

Brothers. He testified that he was sent to Harrison Brothers by Job Crafters and that once at Harrison Brothers' shipyard, he exclusively received instructions from and was supervised by Harrison Brothers. (See Doc. 54-1, Harris Dep. pp. 24-25, 29-32, 36, 43, 45-47, 51). For example, he testified as follows:

Q:      Who gave you your instructions on what to do on a daily basis?

Harris: Supervisors.

Q:      Was it Harrison Brothers' supervisors?

Harris: Yes.

Q:      Anybody else?

Harris: Just Harrison Brothers' supervisors.

Q:      You don't recall anybody else giving you instructions on what to do on any given day?

Harris: No. All I remember is the supervisors.

Q:      Yes, sir. And when you say "supervisors" you are talking about Harrison Brothers' employees?

Harris: Yes.

(Id., p. 47).

Harris's testimony is supported by Troy Murphy ("Murphy")[5] who was Job Crafters' manager at

---

[5] Murphy made the following statement:

> 7. At all times and with respect to the leased employees, Job Crafters never exercised control over the leased employees while at Harrison Brothers or over the work that the leased employees performed for Harrison Brothers. All work done by the leased employees was solely the work of Harrison Brothers. Harrison Brothers' management decided what

the time Harris worked at Harrison Brothers, and Harrison,[6] Harrison Brothers' president. (See Doc. 54-2, Murphy Aff. ¶ 7; Doc. 54-3, Harrison Aff. ¶ 5). In addition, the 2005-2006 Contract states that "employees will work under the direction of [Harrison Brothers'] supervision." (Doc. 54-2, Murphy Aff., Ex. A). The above evidence clearly shows that Harrison Brothers supervised and controlled Harris while he was working in their shipyard.

Furthermore, the only contact Harris had with Job Crafters was filling out an application and occasionally going by to look at job openings and pick up his weekly paycheck. (Doc. 54-1, Harris Dep. pp. 25, 29-32, 36). This "mere incidental and occasional contact" with Job Crafters is not sufficient to rebut Harrison Brothers' evidence of control. Magnon v. Forest Oil Corp., 2007 WL 2736612, at *3 n.16 (W.D. La. Sept. 18, 2007)(citing see Allen v. Texaco, Inc., 2001 WL 611391, at *4 (E.D. La. June 5, 2001)); see Hudson v. Forest Oil Corp., 2003 WL 2004445 (E.D.La. Apr. 28, 2003)( "borrowing employer" had sufficient control over the "borrowed employee" despite the fact that the employee had contacted his general employer once for instructions on how to repair the motor that eventually exploded and injured the plaintiff because

---

> particular work the leased employees were assigned to do at the shipyard, not Job Crafters... All of Job Crafters' leased employees were at all times subject to the control, supervision and instructions of Harrison Brothers...

[6] Harrison made the following statement:

> 5. All of the work performed at Harrison Brothers by Emil Harris and the other leased employees was solely the work of Harrison Brothers. Harrison Brothers determined when a leased employee would work and the hours that the leased employee would work. Either I or my assistant Mark Tate, gave the orders and directions as to what work would be performed at Harrison Brothers by the leased employees and assigned the leased employees to their respective positions at Harrison Brothers. This included Emil Harris...

the plaintiff had to show that he had recurring conversation with the general employer about his actual work duties).

However, Carwie and Knudsen correctly point out that both of Harris's immediate supervisors, Haig and Russell, were technically Job Crafters' employees at the time of the accident. As a result, they maintain that Harris was actually receiving direction from Job Crafters and not Harrison Brothers. (Doc. 61, pp. 11-13; Doc. 66., p. 9; see Doc. 54-4, Haig Aff., ¶¶ 4, 6; Doc.54-5, Russell Aff., ¶ 5). Despite this assertion, it is uncontradicted that Job Crafters had no control over Haig or Russell either. For example, Haig had to meet the rules and regulations of Harrison Brothers for its yard and "was given the Harrison Brothers' Employee Manual and was expected to follow it." (Doc. 54-4, Haig Aff., ¶ 5). He also portrayed himself to the outside world as a Harrison Brothers' employee. (See Id., ¶ 6 ("...on my business card it said Harrison Brothers, not Job Crafters... When I talked to customers or anything else, Job Crafters was never brought up or mentioned."). Furthermore, even though Haig conducted safety meetings for the workers underneath him, prepared time sheets for all of the employees under him, and sometimes collaborated and made suggestions to the shipyard owners on the nature of work and quantity of workers, Haig stated that any records he prepared were given to Tate and Harrison and not Job Crafters and also maintained that at the end of every discussion, Tate and Harrison made the final decision. (Id., ¶¶ 7-9, 11). In addition, though Haig was his direct supervisor, Russell received specific instructions regarding his work from Tate (Doc. 54-5, Russell Aff., ¶7), and Job Crafters never came "into the field to give [him] instructions." (Id., ¶8). When he first got to Harrison Brothers, Russell received an orientation on safety procedures "and so forth" from Harrison Brothers. Furthermore, Russell considered himself a Harrison

Brothers' employee. (Id., ¶ 6). In sum, Job Crafters did not send Haig or Russell to Harrison Brothers to supervise Harris or any other Job Crafters' employee. (Doc. 71, pp. 16-17, Haig Aff.(2), ¶ 2). Rather, Harrison Brothers was the company that designated Haig and Russell as foremen at the shipyard. (Id. ¶ 2-3; Doc. 54-4, Haig Aff. ¶ 6; Doc. 54-5, Russell Aff. ¶ 8-9).

"Job Crafters and its management did not supervise or control [any of the leased employee's] work methods at Harrison Brothers... and that in every sense [the leased employees] were treated like any other employee or worker at Harrison Brothers." (Doc. 54-4, Haig Aff. ¶ 6). Haig, Russell, and Harris were under the supervision and control of Harrison Brothers, in particular Harrison and Tate. Considering the undisputed evidence submitted by the parties in the light most favorable to the plaintiff, the court finds that the control factor weighs heavily in favor of borrowed employee status.

### 2. Whose work was being performed

It is undisputed that Harris was performing Harrison Brothers' work. Accordingly, this factor weighs in favor of borrowed employee status.

### 3. Agreement between the employers

It is undisputed that Harrison Brothers has not produced a written, signed contract governing the time period in which Harris's alleged accident occurred. As a result, looking to the parties' behavior during that time period, the court finds that there was a meeting of the minds between Job Crafters and Harrison Brothers for Job Crafters to provide leased labor to Harrison Brothers and for Harrison Brothers to have complete supervision and control over those leased employees.

Murphy stated in his affidavit that the parties continued to operate in 2007 under the

same terms as the 2005-2006 Contract (Doc. 54-2, Murphy Aff. ¶ 3 & Ex. A).  As a result,

Carwie and Knudsen point out that the 2005-2006 Contract provides that "[Harrison Brothers]

agrees that all persons sent to them under the terms of this Agreement will be treated as

employees of [Job Crafters]", thus they argue that the explicit terms of the contract show that the

"leased employees" could not be "borrowed employees" of Harrison Brothers. (Id., Ex. A; Doc.

61, p. 17-18; Doc. 66, p. 12).  This court finds, however, that the cited contract provision does

not change the court's determination that there was a meeting of the minds between Job Crafters

and Harrison Brothers for the leased employees to be under the control of Harrison Brothers.

First, "parties to a contract cannot automatically prevent a legal status like 'borrowed employee'

from arising merely by saying in a provision in their contract that it cannot arise." Melancon 834

F.2d at 1245.  Second, the 2005-2006 contract does not contain any express or implied

prohibition against the leased employees from being deemed "borrowed employees" of Harrison

Brothers. (Doc. 54-2, Murphy Aff., Ex. A).  Third, unlike West v. Kerr-McGee Corp., 765 F.2d

526 (5th Cir. 1985) and Alday v. Patterson Truck Line, Inc., 750 F.2d 375 (5th Cir. 1985), cited

by Carwie (See Doc. 61, pg. 18), where the contract provisions explicitly provided that the

defendants have no supervisory authority,[7] the contract in the present case provides for Harrison

---

[7] The Master Service Contract in West between the lending employer and the borrowing
employer contained the following language:

> Contractor [Berry Brothers] is an independent contractor, free of control and
> supervision by Kerr-McGee as to the means or manner of performing all work or
> services hereunder... Neither Contractor nor any person used or employed by
> Contractor shall be deemed for any purpose to be the employee, agent, servant,
> or representative of Kerr-McGee in performance of any work or services... under
> this Agreement.

> West, 765 F.2d at 528.

Brothers to supervise all of Job Crafter leased employees including Harris. (See Doc. 54-2, Murphy Aff., Ex. A)(the 2005-2006 Contract provides that"employees will work under the direction of [Harrison Brothers'] supervision.").

Moreover, "[in] determining borrowed employee status, the parties' actions in carrying out a contract can provide an implied modification or waiver of a contrary express provision." Magnon, 2007 WL 2736612, at *4 (citing Brown, 984 F.2d at 677; Melancon, 834 F.2d at 1245). The evidence before the court indicates that Harrison Brothers controlled the work performed by Harris. Harris admitted that he regarded himself as working for Harrison Brothers and that he took instructions from Harrison Brothers' supervisors. (See Doc. 54-1, Harris Dep. pp. 24, 32, 36, 47, 51). The realities of the work site and the parties' actions, at the least, demonstrate that the parties had an unspoken agreement that Harris was Harrison Brothers' "borrowed employee." See Billizon v. Conoco, Inc., 993 F.2d at 105-106.

In light of the foregoing, this factor weighs in favor of borrowed employee status.

### 4. Acquiescence

"The focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them." Brown, 984 F.2d at 678. In his deposition, Harris testified to his acquiescence of his employment at Harrison Brothers. For example, he testified to the following:

Q:      And was it acceptable to you that you were working for Harrison Brothers?

Harris: I liked it.

Q:      That was okay with you?

Harris: Not getting hurt. No, that wasn't–

Q:      No.  To work at Harrison Brothers was acceptable to you?

Harris: Yes.

Q:      And it was acceptable for you to work under Harrison Brothers' supervision?

Harris: Yes.

(Doc. 54-1, Harris Dep. pp. 35-36; <u>see also</u> <u>Id.</u> at pp. 38-39).

Furthermore, since Harris worked for a company that loaned temporary employees, Harris knew Job Crafters would send him into new work situations.  Except on a few occasions, Harris's work in the shipyard industry has historically been through contract labor companies through which he has been assigned to work for several different shipyards.  (<u>Id.</u>, pp. 11-24).  As a result, Harris routinely acquiesced to going to new shipyards and work situations.  <u>See</u> <u>Capps v. N.L. Baroid-NL Indus., Inc.</u>, 784 F.2d 615, 617 (5th Cir. 1986)(found that the employee acquiesced to the new work situation because the employee worked for a company that loaned temporary employees that would send him to new work situations).  Especially in light of his deposition testimony, this court finds Harris acquiesced to working at Harrison Brothers' yard, a finding which weighs in favor of borrowed employee status

### 5. Termination

Carwie asserts that a complete release of Harris by Job Crafters was necessary to facilitate borrowed employee status.[8]  (Doc. 61, p. 19).  However, the case law clearly states that a finding of borrowed employee status does not require that the lending employer completely

---

[8] The cases which Carwie relies do not stand for this proposition but instead focus on whether the borrowing employer has control over the employee, control which this court found <u>supra</u> that Harrison Brothers had over Harris.  <u>See</u> <u>Standard Oil Co. v. Anderson</u>, 212 U.S. 215 (1909); <u>Marion Steam Shovel Co. v. Bertino</u>, 82 F.2d 541 (8th Cir. 1936); <u>Kiff v. Travelers Ins. Co.</u>, 402 F.2d 129 (5th Cir. 1968).

sever its relationship with the employee. The focus instead is on the lending employer's relationship with the employee while the borrowing occurs. Melancon, 834 F.2d at 1246; Capps, 784 F.2d at 617-618. In the present case, Job Crafters hired Harris and assigned him to work for Harrison Brothers. Once at Harrison Brothers' shipyard, Harris performed Harrison Brothers' work and was under the control and supervision of Harrison Brothers. All Job Crafters' employees, including Harris, worked the same hours as the Harrison Brothers' employees, and only Harrison Brothers, not Job Crafters, could request and authorize overtime. (Doc. 54-4, Haig Aff., ¶ 9). This uncontradicted evidence supports a finding that Job Crafters sufficiently terminated its employment relationship with Harris.

However, Carwie and the limitation plaintiff maintain that no termination occurred since Haig and Russell, Harris's supervisors, were Job Crafters' employees. (See Doc. 61 pp. 19-22; Doc. 66, pp. 13-14). Carwie relies on two cases for his proposition: Brown v. Union Oil Co. of Cal., 984 F.2d 674 (5th Cir. 1993) and Babin v. North Florida Shipyards, Inc., 705 So.2d 66 (D.C.App. Fla. 1997). Unlike Brown, where the general employer provided employees and supervisors for the specific purpose of cleaning drilling mud off of an oil platform, Job Crafters did not provide Haig and Russell for the purpose of supervising and instructing Job Crafters' employees. (Doc. 71, pp. 16-17, Haig Aff.(2), ¶ 2). Instead, Harrison Brothers designated Haig and Russell as foremen. (Id., ¶¶ 2-3; Doc. 54-4, Haig Aff. ¶ 6; Doc. 54-5, Russell Aff. ¶¶ 8-9). Additionally, all the instructions Haig and Russell conveyed to Job Crafters' employees, including Harris, were provided by Harrison and Tate, both Harrison Brothers' employees. (Doc. 54-4, Haig Aff., ¶¶ 7-9, 11; Doc. 54-5, Russell Aff., ¶ 7). Also unlike Brown, where the plaintiff testified that he was supervised by his general employer and only at times received instructions

from his borrowing employer, Harris testified that he was always supervised and instructed by Harrison Brothers. (Doc. 54-1, Harris Dep., pp. 37-38, 47). Furthermore, unlike Babin, where the lending employer regularly visited the work site to monitor its employees and appointed "a leaderman" to supervise its employees (705 So.2d at 67), Job Crafters did not monitor or supervise Harris, Haig, or Russell's performance. Instead, Harrison Brothers supervised all the Job Crafters' employees. (Doc. 54-4, Haig Aff. ¶¶ 11-12). In sum, as described supra, even though Haig and Russell were technically Job Crafters' employees, Harrison Brothers controlled their and Harris's actions at the shipyard, and this court can not ignore the realities of the work site.

In light of the foregoing, it is clear that Job Crafters exercised no control or supervision with respect to its leased employees working for Harrison Brothers, thus Job Crafters' relationship with Harris was sufficiently terminated to weigh in favor of borrowed employee status.

### 6. Tools and Place of Performance

Harris mostly provided his own personal safety gear and his own tools, but Harrison Brothers provided a burning torch and chain fall. (Doc. 54-1, Harris Dep. pp. 39-40). Job Crafters did not provide any tools to Harris. (Id.; Doc. 54-2, Murphy Aff., ¶ 6). Furthermore, it is undisputed that Harris's place of performance was Harrison Brothers' shipyard. In light of the foregoing, this factor leans in favor of borrowed employee status.

### 7. Length of Employment

Harris had worked at Harrison Brothers at least two weeks prior to his accident. (Doc. 54-1, Harris Dep., pp. 35 & 44; Doc. 54-3, Harrison Aff., ¶ 2). In Capps, the Fifth Circuit Court

of Appeals noted that "[w]here the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however, the converse is not true."  There, the plaintiff's injury occurred on his first day of work, and the Fifth Circuit concluded that this seventh factor was neutral.  784 F.2d at 618; <u>see also</u> <u>Brown</u>, 984 F.2d at 679(found this factor was neutral when the plaintiff's injury occurred one month after he started working).  Similarly, in the instant case, this factor is neutral.

### 8. Right to Discharge

It is undisputed that Harrison Brothers could not discharge Harris from his employment with Job Crafters. (<u>See</u> Doc. 55, pg. 28).  Harris admits, however, that Harrison Brothers had the right to discharge him from the Harrison Brothers' shipyard and job site. (Doc. 54-1, Harris Dep. pp. 49-50).  "This arrangement is sufficient to support a finding of borrowed servant status." <u>Brown</u>, 984 F.2d at 679(<u>citing</u> <u>Melancon</u>, 834 F.2d at 1246; <u>Capps</u>, 784 F.2d at 618).  As such, this factor weighs in favor of borrowed employee status.

### 9. Obligation to Pay

It is undisputed that Job Crafters paid Harris for his work at Harrison Brothers. (<u>See</u> Doc. 54-1, Harris Dep. p. 30-31, 50).  However, Harrison Brothers provided the funds from which Harris was paid, and the wage Harris received was based on time records maintained and verified by Harrison Brothers. (Doc. 54-2, Murphy Aff. ¶¶10 & 12; Doc. 54-4, Haig Aff., ¶ 11). While Job Crafters provided the physical paycheck, Harrison Brothers paid Job Crafters a rate Job Crafters established for each employee, including Harris, and that was determined "by a base rate derived from Job Crafters' expense per employee with a margin added on top of that for Job Crafters' overhead and profit." (Doc. 54-2, Murphy Aff., ¶ 10).  This arrangement has been held

to support a finding of borrowed employee status in other cases. See Melancon, 834 F.2d at 1246; Billizon, 993 F.2d at 105-106; Capps, 784 F.2d at 618.

**Conclusion**

After weighing the Ruiz factors, this court finds that Harris was the borrowed employee of Harrison Brothers. As such and for the foregoing reasons, Harrison Brothers' Motion for Summary Judgment (Doc. 54) will be GRANTED as to Harrison Brothers' Second and Third Defenses asserted in its Answer (Doc. 21) to the limitation plaintiff's Counterclaim (Doc.20)[9] and Harrison Brothers' cross-claim (Doc. 45) against co-claimant Carwie, conservator for Harris.[10]

**C. Whether Carwie can sustain a claim of negligence against Knudsen -
Carwie's Motion for Summary Judgment (Doc. 134) &
Knudsen's Motion for Summary Judgment (Doc. 137)**

The LHWCA creates a compensation scheme for injured longshoremen, similar to state workers' compensation laws, that generally replaces negligence causes of action against employers. See 33 U.S.C. §§ 904-905; Levene v. Pintail Enters., 943 F.2d 528, 531 (5th Cir. 1991). Section 905(b), however, permits a longshoreman to sue for injuries resulting from the negligence of a vessel. 33 U.S.C. § 905(b). Since Congress did not "specify the acts or

---

[9] The limitation plaintiff argues that even if this court finds that Harris was the borrowed employee of Harrison Brothers, the "Motion for Summary Judgment has nothing at all to say about the duties of indemnification they owed to Peter Knudsen A/S arising under contract or warranty." (Doc. 66, p. 19). Although 33 U.S.C. § 905(a) has been interpreted by the Eleventh Circuit as not barring contract indemnity actions, § 905(b) explicitly prohibits indemnity action by vessels against an employer and does not differentiate between contractual or tort indemnity. See Smith v. United States, 980 F.2d 1379, 1381 (11th Cir. 1993).

[10] Since this court is granting Harrison Brothers' motion for summary judgment, this court will ignore Harrison Brothers' responses to Carwie and Knudsen's motions for summary judgment (Docs. 143 & 144) and Knudsen's reply to Harrison Brothers' response (Doc. 151).

omissions of the vessel that would constitute negligence," the contours of a vessel's duty to longshoremen are 'left to be resolved through the 'application of accepted principles of tort law and the ordinary process of litigation.'"  <u>Scindia Steam Nav. Co. v. De los Santos</u>, 451 U.S. 156, 165-166, 101 S.Ct. 1614, 1620-1622, 68 L.Ed.2d 1 (1981).

Despite a longshoreman's right to sue a vessel owner for negligence, 46 U.S.C. § 30505, formerly 46 U.S.C. § 183, provides that the liability of the owner of a vessel "shall not exceed the value of the vessel and pending freight" as long as the owner did not have privity or knowledge of the acts of negligence which caused Harris's injuries.  Courts apply a two-step analysis to determine whether a vessel owner is entitled to limit its liability.  First, the court determines the act of negligence which caused the casualty.  Second, the court determines whether the ship owner had knowledge or privity of these acts.  The burden of showing the initial acts of negligence rests with the claimant.  <u>Hercules Carriers, Inc. v. Fla. Dept. of Transp.</u>, 768 F.2d 1558, 1563-1564 (11th Cir. 1985).  Once the negligent act is established, the burden is on the shipowner to show his lack of privity or knowledge.  <u>Coryell v. Phipps</u>, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

In his motion for summary judgment, Carwie asks this court to find Knudsen liable for Harris's injuries because "Knudsen breached its 'active control' duty to Emil Harris under 33 U.S.C. 905(b)."  (Doc. 134, p. 1).  Knudsen, on the other hand, in its motion for summary judgment, asks this court to find that it is "entitled to judgment as a matter of law, inasmuch as it has no liability with respect to the claims for damages being asserted by or on behalf of Mr. Harris; said claims are due to be dismissed, with prejudice."  (Doc. 136, p.1).  Specifically, Knudsen asserts that Carwie "cannot sustain a cause of action based on negligence..." thus "the

Court is not required to evaluate the owner's privity or knowledge of any alleged acts/omissions" to determine if limitation of liability is applicable in this case. (Doc. 137, p. 17).

Since this court, in analyzing both motions for summary judgment, must first determine whether Carwie can sustain a cause of action of negligence, "[t]he starting point in this regard must be [the Supreme Court's] decision in <u>Scindia Steam[ Nav. Co., Ltd. v. De Los Santos</u>, 451 U.S. 156 (1981)] which outlined the three general duties shipowners owe to longshoremen." <u>Howlett v. Birkdale Shipping Co., S.A.</u>, 512 U.S. 92, 98, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994). The Supreme Court described these three duties as follows:

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations under the principal control of the independent stevedore."

> <u>Id.</u>, at 98 (citations omitted).

A breach of one of these duties is actionable only if it is a "legal cause" of the longshoreman's injury; that is the breach of a duty must have been a "substantial factor" in the injury. <u>Moore v. M/V Angela</u>, 353 F.3d 376, 383 (5th Cir. 2003).


**1. The active involvement duty and the active control duty**

In his motion for summary judgment, Carwie alleges that Knudsen breached the second <u>Scindia</u> duty. (Doc. 134, p. 1). Knudsen, on the other hand, argues that the undisputed facts should lead this court to conclude that the plaintiff can not prevail as to the second <u>Scindia</u> duty. (Doc. 137, pp. 23-26). Under this duty, once the stevedore's operations have begun, a vessel

owner may be held liable (1) "if it actively involves itself in the cargo operations and negligently injures a longshoremen ," or (2) "if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Scindia, 451 U.S. at 167.

### a. Active Involvement Duty

It is undisputed that the ship's crew was actively involved in the repairs of the ship and the work in both cargo holds. (See Doc. 145-25). However, "[a]ctive involvement in and of itself does not automatically translate into liability; the active involvement must constitute negligent behavior." Sinagra v. Atlantic Ocean Shipping, Ltd., 182 F.Supp.2d 294, 302 (E.D. N.Y. 2001). This court finds that there is a genuine dispute of material facts as to whether the crew's involvement constituted negligent behavior that proximately caused Harris's accident. Haig and Russell's testimony concerning the crew's removal of the safety rope, chains and hatch covers prior to the day of Harris's accident is circumstantial evidence which could lead a reasonable trier of fact to conclude that the crew's active involvement in taking down the safety ropes and chains and moving the hatch covers was negligent behavior that may have caused Harris's fall.[11] (See Doc. 135, pp. 13-14). However, there is no evidence that the ship's crew

_____

[11] For example, although he was unsure of the exact date, Haig was "pretty sure" he put up a rope around the ladder, but that "it was put up and took down and put up and took down repeatedly." (Doc. 134-10, Haig Dep., p. 2). When asked if he though that he put up the rope before Harris got hurt, Haig stated "I'm pretty sure I did, yes, sir." (Doc. 145-11, Haig Dep., p. 3). Chains were also placed around the ladder at some point prior to Mr. Harris's accident, but the ropes and chains would be taken down if "the crew was working in the area" and if "they needed access to get through there." (Doc. 134-11, Russell Dep., p. 2). Russell also testified that he remembered "the chains being up" and that "[t]here was also ropes up at one time" and that [i]f the crew was working in the area, then, yes, they would take them down if they needed access to get through there." (Doc. 145-15, Russell Dep., p. 2). Furthermore, there were no chains or stanchions installed at the time of Mr. Harris's accident. (Doc. 134-9, Davis Dep., p. 2). After the accident, Russell installed the chains around the ladder because "they had taken

had any direct involvement on the day of Harris's accident in the removal of any rope, chains, or hatch covers. (see Doc. 137-8, Haig Dep., pp. 38-39; Doc. 137-11, Russell Dep., pp. 19-21; Doc. 137-12, Preston Dep., pp. 6-7). Since the mere presence of the ship's crew during repair operations is insufficient to trigger liability under the "active involvement" doctrine[12], since there is circumstantial evidence that a reasonable jury could conclude that the involvement of the vessel's crew was negligence, and since there are material facts in dispute over the crew's involvement on the day of Harris's accident, summary judgment as to the "active involvement" duty is due to be denied for both Carwie and Knudsen's motions for summary judgment.

### b. Active Control Duty

Alternatively, Knudsen could be liable under the second Scindia duty for Harris's injuries "if it fail[ed] to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." Scindia, 451 U.S. at 167. Knudsen asserts that "[t]o give rise to liability under the active control duty, 'Such control must be over the actual methods of work used by the independent contractor and the operative details." (Doc. 146, p. 4)(quoting Gabel v. Klaipeda Transport Fleet, Ltd., 2006 WL 1972238, at *5 (S.D.Miss. July 12, 2006)). In support of this

_____

them down." (Doc. 137-11, Russell Dep., p. 22). Haig also testified that he requested that the ship's crew stack the hatch covers in the hold in such a position that it would protect against falls from the "tween deck". He testified that the crew "did it for awhile but then they always had to move the hatches to do their work." (Doc. 145-10, Haig Dep., pp. 2-3). Haig testified that these covers would "never stay[] in one place" and that "[y]ou never knew where they were going to be when you came in in the morning. They would not leave them in one place." (Doc. 145-11, Haig Dep., p. 2). The movement of these stack covers was accomplished by the ship's equipment that could only be operated by the ship's crew. (Doc. 145-10, Haig Dep., pp. 2-3).

[12] See Bonds v. Mortensen and Lange, 717 F.2d 123, 127 n. 4 (4th Cir. 1983)("we do not take the presence of an officer of the ship's crew to constitute 'active involvement' in discharge operations..."); Hill v. Texaco, Inc., 674 F.2d 447, 450 (5th Cir. 1982).

proposition, Knudsen relies upon <u>Pledger v. Phil Guilbeau Offshore, Inc.</u>, 88 Fed.Appx. 690 (5th

Cir. 2004), <u>Breaux v. United States</u>, 1996 WL 626328 (E.D.La Oct. 23, 1996), and <u>Gabel</u>, 2006

WL 1972238.  These cases in turn rely upon the treatise <u>Admiralty and Maritime Law</u> by

Thomas J. Shoenbaum.  In regards to the active control duty, the treatise states the following:

> Closely related to the active involvement duty is the active control duty, which holds that
> the vessel may be liable "if it fails to exercise due care to avoid exposing longshoremen
> to harm from hazards they may encounter in areas, or from equipment, under the active
> control of the vessel during the stevedoring operation."  This active control may be over
> (1) physical areas on or near the ship, (2) equipment, or (3) the work of independent
> contractors.  To give rise to liability for the latter, such control must be over the actual
> methods of work used by the independent contractor and the operative details.

> Thomas J. Shoenbaum, Admiralty & Maritime Law § 7-10 (4th ed. 2010).

The last sentence makes it clear that control over the actual methods of work used by the

independent contractor and the operative details applies only to the active control over "the work

of independent contractors" and not to the active control over the "physical areas" or the

"equipment."  Therefore, to give rise to liability under the active control duty, such control may

be over (1) physical areas on or near the ship; (2) equipment; or (3) the work of indendent

contractors as long as such control is over the actual mathods of work used by the independent

contractor and the operative details.

This court finds that summary judgment as to the "active control" duty is due to be

denied as to both Carwie and Knudsen's motions because there is a genuine dispute as to

whether the ship's crew had "active control" of the Number One Hold.  While Haig testified that

the chief engineer, who was part of the ship's crew, "directed us in our work" and told "us what

we were to do and what time frame they wanted items done and started and completed and such"

(Doc. 145-7, pp. 2-3) and that the crew "maintained control of the whole vessel" (Doc. 145-10,

p. 2), Haig also testified that while the ship's crew worked "side by side in the same space", the crew never assisted the shipyard with any of the tasks that they were contracted to complete. (Doc. 137-8, Haig. Dep., p. 26). Furthermore, despite the plaintiff's arguments to the contrary (see Doc. 135, pp. 11-13), the two captains of the vessel did not testify that they had control over the Number One Hold or over any of the tasks performed by the longshoremen. (See Doc. 137-6, Sorenson Dep., p. 5 Doc. 134-4, Hovgaard Dep., p. 2). Although the submitted evidence, if believed by the trier of fact, could result in a verdict for Harris, there is also evidence for a reasonable trier of fact to conclude that the ship's crew did not have active control over the Number One Hold or over the longshoremen's work on the vessel.

Knudsen alternatively argues that, even if this court were to assume that Knudsen had active control over the cargo holds, Knudsen would still not be liable to Harris's because any argument concerning inadequate lighting would fail as a matter of law since a vessel owner has no duty to provide adequate light for a longshoreman. (Doc. 137, pp. 24-25). While it is true that a vessel owner is not liable under the "active control" duty merely because it maintains control of the lighting equipment, the vessel owner can be liable if it has "active control" over the area in which the longshoreman was injured. See Masinter v. Tenneco Oil Co., 867 F.2d 892, 897-898 (5th Cir. 1989); Bias v. Hanjin Shipping Co., slip op., 2009 WL 746051, at *5 n. 35 (S.D. Tex. Mar. 18, 2009). Since there is a dispute as to whether the vessel owner had active control over the cargo holds, Knudsen could be found liable at trial for failure to provide adequate lighting if the trier of fact concludes that Knudsen retained active control over the cargo holds.

Furthermore, Knudsen argues that a vessel owner does not have an affirmative duty

under health and safety regulation to provide fall protection to longshoremen, thus it is entitled to summary judgment.[13]  (Doc. 137, pp. 25-26)(citing 29 C.F.R. § 1915.73(d)).  While it is true that an owner has no affirmative duty to provide fall protection to longshoremen, the regulations provide that "this part is not intended to relief owners, operators, agents or masters of vessels who are not 'employers' from responsibilities or duties now placed upon them by law, regulation or custom."  29 C.F.R. § 1915.3(b).  The Supreme Court has placed a duty to vessel owners if they "fail to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation."  Scindia, 451 U.S. at 167.  As a result, if the trier of fact concludes that the vessel's crew maintained active control of the cargo holds, then the vessel may be found liable if it is determined that it failed to exercise due care to avoid exposing Harris to the alleged hazard.[14]

_____

[13] Knudsen also argues in its reply that the hazard in this case is "not the ledge running around the perimeter of the 'tween deck'" since "[e]verybody who has testified on this point confirmed that the wide-open cargo hold adjacent to the "tween deck" ledge was easily observed."  Rather, Knudsen argues "the hazard was the lack of illumination."  (Doc. 150, p. 11).  This court disagrees and finds that a reasonable trier of fact could conclude that the lack of safety rail, chains, or rope around the ladder could also cause the open cargo hold adjacent to the ledge to be a hazard.

[14] Carwie argues that the ship's safety manual, which references Danish regulations, defines "reasonable care insofar as guarding of falls, adequate illumination and its responsibility to eliminate hazards for contract workers coming aboard the vessel." (Doc. 149, p. 11; see Doc. 135, pp. 15-18 & Doc. 145, p. 21-24).  Under the active control duty, Carwie must show that Knudsen "fail[ed] to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment" but must first show that the cargo holds or any equipment was "under the active control of the vessel during the stevedoring operation." See Scindia, 451 U.S. at 167.  Since this court has concluded that there is a dispute as to whether the vessel owner had active control over the cargo holds, it is not necessary at this time to determine whether Knudsen has exercised due care.

**2. Duty to Intervene**

In his brief in support of his motion for summary judgment, Carwie stated "[f]or the purpose of this Motion for Summary Judgment, only the active control duty is relevant." (Doc. 135, p. 10). However, because "Harris's 'claim' in intervention does not specifically address or identify which Scindia duty is alleged to have been breached," Knudsen, in its motion for summary judgment, addressed "each of the Scindia duties, and demonstrate that, judgment in its favor as to all claims of... Harris is due to be granted." (Doc. 137, pp. 18-19). Knudsen specifically argues that "the 'duty to intervene' [the third Scindia duty] cannot sustain Mr. Harris's claim of negligence." (Id., p. 20).

This third Scindia duty, commonly called the "duty to intervene," "concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore." Howlett, 512 U.S. at 98, 114 S.Ct. 2057. Where the operations have begun and when the shipowner is not actively involved, the vessel owner "must have actual knowledge of the hazard before it may be held liable." However, if the "operations have commenced and the shipowner is actively involved in the operations, the shipowner may be held liable if it had constructive knowledge of the hazard." Lampkin v. Liberia Athene Transport Co., Ltd., 823 F.2d 1497, 1501 (11th Cir. 1987). Even though there is a dispute as to whether the vessel owner gave principal control of the cargo holds to the independent stevedore, it is undisputed that the ship's crew was actively involved in the repairs of the ship and the work in both cargo holds. (See Doc. 145-25). Therefore, assuming that Knudsen gave principal control of the cargo holds to the independent stevedore, if Knudsen has constructive knowledge of an apparently dangerous condition that presents an unreasonable risk or harm to the longshoremen,

it may have a duty to intervene and remove the hazard.  See Scindia, 451 U.S. at 173, 101 S.Ct. at 1624.

In this case, there is abundant evidence concerning the crew's removal of the safety rope, chains, and hatch covers prior to the day of Harris's accident.  There is, likewise, abundant evidence that the rope, chains, and hatch covers were placed in a way to protect someone from falling off the "tween deck".  Furthermore, for the reasons stated in the "active control" section supra, there is a dispute over whether the vessel's crew or the independent stevedore had principle control over the ship, a fact which is a threshold determination of whether this duty applies in this case.  As a result, there is ample evidence to go to the jury on the issues of whether the vessel owner or the independent stevedore had control over the ship and if the independent stevedore had control, whether the vessel owner had constructive notice of an allegedly dangerous condition that may have been the proximate cause of the accident.  Therefore, summary judgment as to the third Scindia duty is due to be denied.

### 3. Turnover Duty

In its motion for summary judgment, Knudsen asks this court to grant summary judgment as to the first Scindia duty, "which courts have come to call the 'turnover duty,' relates to the condition of the ship upon the commencement of stevedoring operations." (Doc. 137, p. 19); Howlett, 512 U.S. at 98, 114 S.Ct. 2057.  This duty places two responsibilities on the vessel owner: (1) a duty to exercise ordinary care under the circumstances to turnover the ship and its equipment in such a condition that a competent contractor/repair yard can carry on its operations with reasonable safety; and (2) a duty to warn the contractor of latent or hidden dangers which are known to the vessel or should be known to it.  Id. at 99-100.  The duty to warn, however, is

narrow.  It does not include dangers which are either (1) open and obvious, or (2) which a reasonable competent contractor should anticipate encountering.  First, there is no evidence that the condition of the ship or its equipment were in any way problematic upon the turnover of the vessel.   Second, this court finds that the duty to warn of latent or hidden dangers did not arise because a reasonable jury could not conclude, based on the undisputed facts, that the dangers posed by the lack of ropes, chains, or guardrails were not open and obvious to everyone working on the vessel.  As such, summary judgment as to the first <u>Scindia</u> duty is due to be granted.


## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is hereby **ORDERED** that Carwie's Motion for Summary Judgment (Doc. 134) is **DENIED.**  It is further **ORDERED** that Knudsen's Motion for Summary Judgment (Doc. 137) is **GRANTED** as to the first <u>Scindia</u> duty which is the turnover duty, but **DENIED** as to all remaining duties. Lastly, it is hereby **ORDERED** that Harrison Brothers' Motion for Summary Judgment (Doc. 54) is **GRANTED**.

As a result, the following issues remain to be tried: (1) whether Knudsen was actively involved in the cargo operations and negligently injured a longshoreman ("Active Involvement Duty"); (2) whether Knudsen failed to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation ("Active Control Duty"); (3) whether Knudsen gave principal control of the cargo holds to the independent stevedore, and if so, whether Knudsen had constructive knowledge of an apparently dangerous condition that presents an unreasonable

risk or harm to the longshoremen ("Duty to Intervene"); and (4) if an act of negligence is determined to have caused Harris's injuries, whether the ship owner had knowledge or privity of these acts ("Limitation of Liability").

**DONE and ORDERED** this 28th day of April, 2010.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE