**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT | ) ) ) |
| OF | ) ) ) |
| PETER KNUDSEN A/S, Owner of the M/V VINLAND SAGA (IMO No. 812649) for Exoneration from or Limitation of Liability | ) ) ) ) ) CIVIL ACTION NO. 08-00505-CG-B |

**MEMORANDUM OPINION AND ORDER**

On June 10, 2007, J. Gregory Carwie, Esquire ("Carwie"), as conservator for Emil Harris ("Harris"), brought a lawsuit in state court against Peter Knudsen A/S ("Knudsen"), Janus Andersen & Company A/S ("Janus Andersen"), and Harrison Brothers Drydock & Repair Yard, Inc. ("Harrison Brothers") for injuries he allegedly incurred while working at Harrison Brothers' shipyard on board the M/V Vinland SAGA. On August 29, 2008, limitation plaintiff Knudsen filed a complaint in this court for exoneration from or limitation of liability in Carwie's lawsuit because, at the time of the accident, he was the owner of the M/V Vinland SAGA. (Doc. 1). On October 21, 2008, Carwie filed an answer to Knudsen's complaint and filed a claim against Knudsen for negligence. (Doc. 12). On November 30, 2009, the clerk of court entered an order of default against Janus Anderson. (Doc. 115). On April 28, 2010, this court granted Harrison Brothers' motion for summary judgment. (Doc. 156). This matter is now before the court on Knudsen's motions to strike/exclude the testimony of two of Carwie's experts (Docs. 158 & 159) and Carwie's responses. (Doc. 165 & 166).[1] For the reasons stated below, Knudsen's motions

---

[1] Knudsen suggests that a hearing on its motions would assist the court. The decision of whether to conduct a Daubert hearing in a particular case is discretionary. See Corwin v. Walt

to strike/exclude expert testimony are due to be DENIED.

## **BACKGROUND**

Harris, a pipefitter by trade, alleges that he was injured on September 28, 2006, when he fell while traversing a platform or walkway in one of the cargo holds of the M/V Vinland SAGA. (Doc. 12, ¶ 4). Subsequent to the alleged incident, Harris filed a claim for and has received workman's compensation benefits under the LHWCA. (See Doc. 14). At all times relevant hereto, Knudsen, a Danish corporation, owned the M/V Vinland SAGA, which is a Danish general cargo vessel. (Doc. 134-1, Knudsen Aff., p. 2). This vessel has two working cargo holds, Number One Hold forward and Number Two Hold aft, which were separated into two decks, a lower hold and a "tween deck." In order to enter Number One Hold from the weather deck/main deck, access must be made through an opening on the main/weather deck. (Doc. 134-6, Alexander Dep., p. 2; Doc. 134-43, pp. 3-4; Doc. 142, p. 2). In order to travel from the main/weather deck to the bottom of the cargo hold, a person would need to descend an access ladder via a small opening or hatch cover on the main deck (Doc. 137-10, Hartley Dep., pp. 7-13; Doc. 137-8, Haig Dep., pp. 10-12). The ladder from the main deck stopped at the "tween

---

Disney Co., 475 F.3d 1239, 1252 n. 10 (11th Cir. 2007)(in Daubert context, "although they are often helpful, hearings are not prerequisite to such determinations under the Federal Rules or established law"); Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1113 (11th Cir. 2005)("the trial court was under no obligation to hold" Daubert hearing, which was "not required, but may be helpful in complicated cases involving multiple expert witnesses"(citations and internal quotation marks omitted)); United States v. Frazier, 387 F.3d 1244, 1264 (11th Cir. 2004)("a district court need not conduct a Daubert hearing in every case"). In this case, the court exercises its discretion to rule on Knudsen's motions without a hearing. Knudsen and Carwie have submitted briefs setting forth their support and objections to the admissibility of the two expert's opinions. After a review of these materials, as well as the experts' reports, deposition excerpts, supporting literature and other documentation, the court is well-equipped to address the merits of the motion without a hearing.

deck" which consisted of a ledge or "catwalk" running around the perimeter of the hold. (Doc. 137-10, Hartley Dep., pp. 9-10). The "tween deck" was approximately seven feet from the bottom (tank top) of the hold and about four feet wide. (Doc. 134-7, Alexander Dep., p. 2; Doc. 137-8, Haig Dep., p 36). The "tween deck" was comprised of metal plates which could be opened to allow full use of the cargo hold, i.e. from the bottom of the cargo hold (sometimes referred to as the "tank top") all the way to the main hatch covers on the weather deck/main deck. If the "tween deck's" floor plates were removed, the ledge or catwalk was open to the bottom of the cargo hold or tank top. (Doc. 137-3, Andreassen Dep., pp. 5-9). After climbing down the access ladder from the main deck to the "tween deck", a person would have to walk a few feet forward and descend a second ladder to the bottom or tank top. (Doc. 137-10, Hartley Dep., pp. 8-13; Doc. 137-8, Haig Dep., pp. 9-11).

In early March 2006, the Vinland SAGA loaded a cargo of heavy anchor chains in Bilbao, Spain. (Doc. 137-3, Andreassen Dep., pp. 3-4; Doc. 137-6, Sorenson Dep. (Vol. 1), p. 3). When the anchor chain was loaded in Bilbao, the "tween decks" were open allowing the chain to fill up most of the cargo hold. (Doc. 137-6, Sorenson Dep. (Vol. 1), pp. 5-9; Doc. 137, Sorenson Dep. (Vol. 2), pp. 3-4). John Sorenson and Captain Hovgaard were the captains and John Andreassen was the Chief Engineer aboard the vessel during the voyage from Bilbao. (Doc. 137, p. 4, n. 4 & 7). Captain Sorenson testified that the crew put lashings to secure the "tween deck" plates in place prior to the sea voyage from Bilbao to the United States. (Doc. 137-7, Sorenson Dep. (Vol. 2), pp. 3-4). In route to Port Forchon, the Vinland SAGA suffered a breakdown in its propulsion system near the Bahamas. (Doc. 137-6, Sorenson Dep. (Vol. 1), pp. 3-4). After being towed several times, the vessel ultimately arrived in Mobile, Alabama. (Doc.

137-2, Lyborg Dep., pp. 4-8; Doc. 137-3, Lyborg Dep., pp. 10-11).

The Vinland SAGA arrived at Harrison Brothers' shipyard in Mobile, Alabama, on or about August 21, 2006. (Doc. 137-10, Hartley Dep., pp. 3-4; Doc. 137-8, Haig Dep., pp. 4-5). It was then moved to a floating drydock on August 30, 2006. (Doc. 137-10, Hartley Dep., p. 5). Mike Haig, who was Harris' supervisor, testified that a detailed inspection of the vessel was carried out by Harrison Brothers' personnel and the ship's officers to survey the work to be completed in the holds of the vessel and also to identify any hazards or problems which its workers might encounter on the vessel. (Doc. 137-8, Haig Dep., pp. 6-7, 14, 42-43). During that initial inspection, the "tween deck" was allegedly open with the metal floor plates stacked at the ends of the cargo holds. (Doc. 137-10, Hartley Dep., pp. 13-15, 19-21; Doc. 130-8, Haig Dep., pp. 8-9). Haig testified that he was concerned about the open "tween deck", a potential hazard which he identified when he climbed down the ladder the first time on August 31, 2006. Haig thought that some sort of barrier should be installed at the base of the ladder adjacent to the cargo hold but he did not install any such barrier at that time nor did he discuss his thoughts with the ship's crew or ask if the ship had anything that could be used for this purpose. (Doc. 137-8, Haig Dep. 16-17, 23, 27-33). The ship's crew did not alert Haig of any hazards or otherwise in relation to the vessel. (Doc. 145-7, p. 2).

While the ship was drydocked, the ship's crew remained onboard the vessel. (Doc. 142, ¶ 5). Haig testified that the ship's crew and the shipyard workers were doing separate tasks in relation to the vessel. (Doc. 145-6, Haig Dep., p. 2). The interaction between the ship's crew and the shipyard workers, however, is in dispute. Haig testified that the chief engineer, who was Haig's contact with the ship's crew, "directed us in our work" and told "us what we were to do

4

and what time frame they wanted items done and started and completed and such" (Doc. 145-7, Haig Dep., pp. 2-3) and that the crew "maintained control of the whole vessel." (Doc. 145-10, Haig Dep., p. 2). Furthermore, Haig testified that the shipyard workers were having "issues with [the vessel's crew] moving our equipment and moving the hatches." (Doc. 149-1, Haig Dep., pp. 2-3). On the other hand, Haig testified that the ship's crew worked "side by side in the same space" but that they never assisted the shipyard with any of the tasks that the shipyard was assigned or contracted to complete. (Doc. 137-8, Haig. Dep., p. 26). Captain Sorenson testified that his crew were not working together with the other workers and that he had authority over his crew when they were in the cargo hold. (Doc. 137-6, Sorenson Dep., p. 5). Captain Hovgaard testified that the ship's crew "had control of their own work during the operation in the cargo hold" and when asked "for their own work, they would have had control of the ladder and the "tween deck" ledge and the ladder going from the "tween deck" down to the tank top cover, correct" to which he responded "[y]eah, that's correct." (Doc. 134-4, Hovgaard Dep., p. 2).

On September 28, 2006, Harris fell from the "tween deck" to the bottom (tank top) and was injured. (Doc. 137-11, Russell Dep., p. 21). Although he was unsure of the exact date, Haig was "pretty sure" he put up a rope around the ladder, but that "it was put up and took down and put up and took down repeatedly." (Doc. 134-10, Haig Dep., p. 2). When asked if he thought that he put up the rope before Harris got hurt, Haig stated "I'm pretty sure I did, yes, sir." (Doc. 145-11, Haig Dep., p. 3). Chains were also placed around the ladder at some point prior to Mr. Harris's accident, but the ropes and chains would be taken down if "the crew was working in the area" and if "they needed access to get through there." (Doc. 134-11, Russell Dep., p. 2). Russell also testified that he remembered "the chains being up" and that "[t]here was also ropes

5

up at one time" and that [i]f the crew was working in the area, then, yes, they would take them down if they needed access to get through there." (Doc. 145-15, Russell Dep., p. 2). There is no evidence, however, of the ropes or chains being up and removed on the day of the accident. (See Doc. 137-8, Haig Dep., pp. 38-39; Doc. 137-11, Russell Dep., pp. 19-21; Doc. 137-12, Preston Dep., pp. 6-7), but there were no chains or stanchions installed at the time of Mr. Harris's accident. (Doc. 134-9, Davis Dep., p. 2). After the accident, Russell installed the chains around the ladder because "they had taken them down." (Doc. 137-11, Russell Dep., p. 22). Haig also testified that he requested that the ship's crew stack hatch covers in the hold in such a position that it would protect against falls from the "tween deck". He testified that the crew "did it for awhile but then they always had to move the hatches to do their work." (Doc. 145-10, Haig Dep., pp. 2-3). Haig testified that these covers would "never stay[] in one place" and that "[y]ou never knew where they were going to be when you came in in the morning. They would not leave them in one place." (Doc. 145-11, Haig Dep., p. 2). The movement of these stack covers was accomplished by the ship's equipment that could only be operated by the ship's crew. (Doc. 145-10, Haig Dep., pp. 2-3).

On the day of the accident, Harris was instructed to finish removing the fire line piping from the Vinland SAGA. This work required Harris to go from the main/weather deck to the bottom (tank top) of the Number One Hold. (Doc. 137-11, Russell Dep., p. 9). Harris did not voice any concerns to Russell about working on the Vinland SAGA. (Id., p. 10). Russell testified that he did not receive any reports that there were any hazardous conditions on the vessel. (Id., p. 11). After receiving his assignment, Harris proceeded to the Number One Hold for the first time. He testified that he "did know one thing when I was going down there, that I

6

wasn't comfortable with it. It wasn't no light. It was dark." (Doc. 137-9, Harris Dep., p. 18). Harris had a flashlight in his tool bag, and anticipating using the flashlight once he got "there on the job", he did not use the flashlight prior to his accident. (Id., p. 23). Harris did not alert Harrison Brothers or any of his supervisors of "any unsafe condition that you saw on this ship, dark smoke, no chains, anything like that". (Id., p. 20). Harris further testified that it was "[t]oo dark to be in there. There should have been more light", and when asked if he could see from the weather deck to the "tween deck" platform, Mr. Harris testified he could not. (Id., p. 224). Harris stated that once he got on the "tween deck", another person was coming down the ladder, thus he moved to give the other person some room, an action which caused him to fall to the tank top. When asked why he fell, he testified that "I guess the platform wasn't as big as it was supposed to have been" but stated he did not trip on anything. (Id., p. 127). Wesley Alexander, a welder, was assigned to work with Harris on the day of the accident and the person who was following Harris down the ladder. Alexander also testified that there was "[n]ot much light... mainly only light I remember is coming through the access hole." (Doc. 137-14, Alexander Dep., pp. 3-7).

In its order ruling on Carwie's and Knudsen's motions for summary judgment, this court found that there were some genuine disputes as to several material facts and determined that the following issues remain to be tried: (1) whether Knudsen was actively involved in the cargo operations and negligently injured a longshoreman ("Active Involvement Duty"); (2) whether Knudsen failed to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation ("Active Control Duty"); (3) whether Knudsen gave principal control of

7

the cargo holds to the independent stevedore, and if so, whether Knudsen had constructive knowledge of an apparently dangerous condition that presents an unreasonable risk or harm to the longshoremen ("Duty to Intervene"); and (4) if an act of negligence is determined to have caused Harris's injuries, whether the ship owner had knowledge or privity of these acts ("Limitation of Liability"). (Doc. 156).

Carwie proposes to have two experts testify at trial. First, the plaintiff wishes Edward G. Webster to testify who describes himself as a "Naval Architect, Marine Surveyor and Marine Safety Expert" that "has been actively engaged in the marine industry worldwide for the past 40 years, and has extensive experience with the operation and maintenance of general cargo ships." (Doc. 170-3). The plaintiff wants Mr. Webster to give an opinion "that Mr. Harris was not responsible for the accident occurring" and that "[a]t the time of the accident a court may find that the Owners, Operators, and Captain of the MV Vindland Saga were responsible for this accident, and that the vessel was unseaworthy and unfit for its intended service..." (Id., pp. 3-4). Second, Carwie wants Catherine Brock, who is a occupational therapist with a certification in life care planning, to testify. (Doc. 169-1, pp.2-5). Carwie would like Ms. Brock to give an expert opinion that "Mr. Harris will continue to suffer from limitations" from his injury and "will continue to require supervision, medical management, medication, routine exercise, durable medical equipment and assistance with home maintenance tasks" and also give testimony as to how much these various needs will cost over his expected lifetime. (Doc. 169-3, p. 6-7).

## LEGAL ANALYSIS

### A. Legal Standard

The starting point for any discussion of the admissibility of opinion testimony offered by

"expert witnesses" is Federal Rule of Evidence 702. As amended in 2000,[2] Rule 702 provides that

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> Fed.R.Evid. 702.

In light of the language above, "the requirements of this rule can be grouped under three broad headings: qualifications, reliability, and helpfulness." Beam v. McNeilus Truck and Mfg., Inc., – F.Supp.2d –, 2010 WL 1069616, at *2 (N.D.Ala. Mar. 24, 2010)(emphasis in original)(citations omitted).

A "trial court has wide discretion in determining whether to exclude expert testimony". Montgomery v. Noga, 168 F.3d 1282, 1303 (11th Cir. 1999)(quoting United States v. Cross, 928

---

[2] These amendments were made in response to the Supreme Court's seminal decisions in the "Daubert Trilogy" - Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), General Electric Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), and Kumho Tire Co., Ltd.. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). In Daubert, the Court made it clear that the requirement of reliability found in Rule 702 was the centerpiece of any determination of the admissibility of opinion testimony, 509 U.S. at 589, and the Court identified four factors to be used in determining the reliability of scientific evidence. Id. at 593-594. In Joiner, the Court established the standard for reviewing trial court rulings of admissibility and held that such rulings would be made under an abuse of discretion standard. 522 U.S. at 141. The Court also established the important test of analytical "fit" between the methodology employed by an expert witness and the conclusions drawn. Id. at 146. The Court reasoned that just because a methodology is acceptable for some purposes, it may not be acceptable for others, and a court may not admit evidence when there is "simply too great an analytical gap between the data and the opinion proffered." Id. In Kumho Tire, the Court made it clear that testimony based solely on the experience of an expert would not be admissible. 526 U.S. at 157. The expert's conclusions must be based on sound scientific principles, and the discipline itself must be a reliable one. Id. at 156.

F.2d 1030, 1049 (11th Cir. 1991). However, due to the Daubert decision,[3] a district court must act as a "gatekeeper" and

> engage in a rigorous inquiry to determine whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated by Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."
>
> Rink v. Cheminova, Inc., 400 F.3d 1286, 1291-1292 (11th Cir. 2005)(quoting City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998)(footnote omitted)); see also United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004)("While there is inevitably some overlap among the basic requirements... they remain distinct concepts and the courts must take care not to conflate them.").

The Court of Appeals for the Eleventh Circuit has stated that "[t]he party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." Rink, 400 F.3d at 1292(citing Allison v. McGhan Medical Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)).

In regards to "reliability" under Rule 702, "this Court has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the facts." Whatley v. Merit Distribution Services, 166 F.Supp.2d 1350, 1353 (S.D.Ala. 2001)(citations omitted).

> The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." [Daubert,] 509 U.S. at 590, 113 S.Ct. 2786... It "requires a valid... connection to the pertinent inquiry as a precondition to admissibility." Id., at 592, 509 U.S. 579, 113 S.Ct. 2786... And where such testimony's factual basis, data, principles, methods, or their

---

[3] The Daubert decision held that the "general acceptance" test in Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (D.C.Cir. 1923) "should not be applied in federal trials" because it had been superceded by the Federal Rules of Evidence enacted by Congress in 1975. Daubert, 509 U.S. at 588-589 & n. 6. Instead, Daubert substituted the trial court judge, acting in the role of "gatekeeper." See Id. at 593-594.

application are called sufficiently into question, [] the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S. at 592, 113 S.Ct. 2786...

Kumho Tire Co, Ltd. v. Carmichael, 526 U.S. 137, 149, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999).

To aid in this determination, a court looks to the non-exclusive factors set forth in Daubert: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether the theory has a high known or potential rate of error and there exists standards controlling the technique's operation; and (4) whether the theory has attained general acceptance within the relevant scientific community. Daubert, 509 U.S. 593-594. These "four factors are not exhaustive", and "[t]he primary focus should be 'solely on the principles and methodology, not on the conclusions that they generate.'" Mcrevy v. Ryan, slip op., 2009 WL 4730728, at *2 (S.D.Ala. Dec. 4, 2009)(quoting Daubert, 509 U.S. at 595).

However, the Supreme Court in Kumho provided that looking at these factors is discretionary and "may" be considered in determining the admissibility of expert testimony based on technical or other specialized knowledge but stated that in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience." 526 U.S. at 150. The Supreme Court stated that the particular circumstances of a case determine "how to test an expert's reliability." Id. at 150 & 152. In this respect, "the law grants the trial judge broad latitude." Id. at 153. What is important is that the judge "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

11

**B. Discussion**

Knudsen first argues that Carwie's expert Geoffery Webster's testimony is not admissible under Federal Rule of Evidence 702 because (1) Mr. Webster's testimony is not based on knowledge that would assist the trier of fact in understanding the evidence, (2) he has not established that he used a reliable method to reach his conclusions, (3) he does not apply what method he does employ reliably to reach his conclusions; and (4) his conclusions invade the province of the trier of fact. (Doc. 158, pp. 1-2). Second, Knudsen argues that Carwie's expert Catherine Brock's testimony is also not admissible under Federal Rule of Evidence 702 because (1) she "has not established that her methodology as a life care planner is consistent with the accepted methodology in her field"; and (2) "she does not consistently verify the facts she asserts, relying on general experiences as a therapist and home health care provider to make ipse dixit assertions." (Doc. 159, p. 8).

**1. Geoffery Webster**

The circumstances of this case, and of Mr. Webster's testimony, do not easily lend themselves to the factors identified in Daubert. Rather, this is one of those situations in which the relevant reliability concerns focus upon personal knowledge or experience. Mr. Webster's experiences as a technical manager for various vessels and auditing vessels for safety requirements through his tenure at the Bureau Veritas and his certification through the ISM is generally relevant to this case which revolves around an injury on a dry-docked vessel and the duty owed by a vessel owner to a longshoreman. Although the observation that Mr. Webster is qualified as an expert by experience bears on the reliability of his proffered testimony, experience alone does not necessarily render reliable any conceivable opinion he has. Frazier,

387 F.3d at 1261(holding that the "reliability criterion remains a discrete, independent, and important requirement for admissibility.").

Therefore, the next step is to determine if Mr. Webster's methodology is reliable. To admit expert testimony, a trial court must assess whether the methodology underlying the proposed testimony is valid and properly applied to the facts in issue. Id.(citing Daubert, 509 U.S. at 592-593). Non-scientific, experienced-based testimony, like Mr. Webster's, will be admissible only if it is "properly grounded, well reasoned, and not speculative." United States v. Masferrer, 367 F.Supp.2d 1365, 1373 (S.D.Fla. 2005)(quoting Fed.R.Evid. 702 Advisory Committee Notes (2000 amends.)). An expert's testimony need only be found to rest on "good grounds" to be admissible. Quiet Tech. DC-8, Inc. v. Hurel-Dubois U K Ltd, 326 F.3d 1333, 1345 (11th Cir. 2003). Once an expert's testimony is deemed valid, it is up to the adversarial vehicles of cross-examination and competing expert testimony to test any alleged flaws in the expert's results. Id.

Knudsen attacks Mr. Webster's testimony because "the method Mr. Webster describes in stating how he reaches his opinion markedly departs" from "his experience acting as a technical manager for various vessels and auditing vessels for safety requirements through his tenure at the Bureau Veritas and his certification through the ISM." Specifically, Knudsen maintains that Mr. Webster's "experience would be in examining conditions aboard vessels to note any failure to conform with safety regulations, possibly even investigating accidents that are related to hazardous conditions", but he points out that the majority of the materials provided to Mr. Webster came from the attorney who hired him and that Mr. Webster testified that he did not interview Mr. Harris nor did he "perform the functions that he conceivably would in performing

13

an actual investigation or vessel survey, stating he never took pictures of the accident site, never took measurements, and never requested the pictures, measurements, or investigation notes of the auditor who examined the ship after the accident." (Doc. 158, pp. 3-4).

On the other hand, the plaintiff points out that "Mr. Webster does not rely entirely on materials provided by the engaging attorney" but that "Mr. Webster independently researched other documents, regulations, and industry standards as shown in Appendix I of his supplemental report..." (Doc. 166, p. 4). Appendix I lists several codes and regulations, treaties, and "[c]orrespondence between Harrison Brothers, Mr. Lyborg, Janus Andersen, B.V., and others." (Doc. 170-5). Furthermore, Carwie maintains that Mr. Webster reviewed "pictures specifications, measurements, a schematic diagram of the vessel and an investigation report of the ship..." and any actual examination of the ship by Mr. Webster was impossible since "the M/V Vinland Saga was sold in 2007 and has not been available for inspection." (Doc. 166, p. 5).

While Mr. Webster's methodology and testimony are subject to question, in light of the arguments provided and upon a review of the record this court finds that Mr. Webster's methodology appears to be valid. The issues Knudsen raises are fodder for cross-examination but are not grounds to exclude the evidence. As stated by the Supreme Court, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[4] Daubert,

---

[4] Knudsen also argues that "[t]he lack of reliability of Mr. Webster's method predictably produces results that do not reflect the actual facts examined in this case, as they are colored by the preferences of counsel." (Doc. 152, p. 5). Specifically, Knudsen argues that Mr. Webster applies incorrect or incomplete facts and/or law in finding that Knudsen owed a duty under OSHA and ISM. (Id., pp. 5-7). Again, this court finds that these arguments concern the weight of the evidence rather than the reliability of the expert's methodology or application of that methodology. Therefore, Knudsen's concerns are subject to cross-examination but are not

14

509 U.S. at 595, 113 S.Ct. 2786).

Knudsen alternatively argues that "[t]he majority of Mr. Webster's testimony in this case, as evidenced in his expert reports and deposition, consists of little more than torturing United States and international laws and regulations to produce a questionable series of duties that Knudsen allegedly owed the Plaintiff while his vessel was in drydock at Harrison Brothers" and "[i]t is well established in federal courts that legal conclusions are not the province of an expert witness." (Doc. 158, p. 9). This court agrees that the duty owed to Harris by Knudsen is determined by the court. Nevertheless, the scope of the duty owed is dependent in part on the nature of Knudsen's knowledge and involvement in the circumstances leading to the accident. Here, as indicated in the court's ruling on the motions for summary judgment, it is undisputed that the vessel's crew was actively involved in the cargo hold operations but there is a genuine dispute as to whether the crew's involvement constituted negligent behavior that proximately caused Harris' accident. (See Doc. 156, p. 29). In addition, the vessel's alleged involvement in the cargo hold operations and their interactions with the longshoremen affects Knudsen's active control duty or duty to intervene under Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981). Although the duties owed remain the same and are determined by this court, the fault of Knudsen for what they did or failed to do within the confines of those legal duties are issues for trial. Mr. Webster's testimony may well "assist the trier of fact to understand the evidence or to determine a fact in issue" for purposes of Federal Rule of Evidence 702. To the extent it encroaches on a legal opinion, the court as the fact finder will simply disregard it.

## 2. Catherine Brock

---

grounds for excluding Mr. Webster's testimony.

Carwie seeks to rely on the testimony of Catherine Brock as a life care expert. Knudsen argues that Ms. Brock's opinions and reports are not related to the facts in the instant case or based on a sound methodology. (Doc. 159). In her deposition Ms. Brock described her methodology as follows:

> Q: ... Why don't you go on and tell us what your methodology is?
>
> A: Okay. Following initial contact of being asked if I can - If I am available to write a life care plan, I request the medical records involved in the injury as current as possible. Upon receipt of the medical records, I review those records thoroughly, to have a foundation of the injury, the diagnosis and what treatment has occurred. I then contact the patient or the client. I meet with the patient or client, typically in their home, so that I can assess their level of function and their environment. Following this meeting and assessment of the patient, I then return to my office for several hours of contacting treating professionals, performing any research that is required, gathering the recommendations and then ultimately putting the report together.
>
> Q: Gather the what? What did you say? You are gathering what?
>
> A: Any recommendations.
>
> Q: From the doctors, treating physicians?
>
> A: From doctors, from treating professionals. Not just M.D.s. But any therapist or treating professional that is involved in the patient's care, they are contacted regarding their recommendations. And essentially my job is to compile all of these recommendations and include them in this final report.
>
> Q: And is that what methodology you followed in this case?
>
> A: Yes.
>
> (Doc. 169-2, Brock Dep., p. 2).

This described methodology is similar to the methodology of Larry Forman, a life care expert, in R.K. v. Kanaskie, 2007 U.S.Dist. LEXIS 50361, at *29-30 (S.D.Fla. July 12, 2007). Like in R.K., where Mr. Forman reviewed the records pertaining to the condition of the client such as

16

records of treatment, evaluation and diagnosis, interviewed the client, examined the treatments that have been provided and recommended, and consulted with any experts and medical professionals, Ms. Brock also testified that she reviewed all the records pertaining to Mr. Harris, interviewed Mr. Harris, and consulted with any treating professionals involved in Mr. Harris' care. (See Doc. 169-3). Although Knudsen points to "some general deficiencies" in Ms. Brock's stated methodology as compared to the methodology described in R.K. (See Doc. 159, pp. 4-5), this court does not find these proposed deficiencies make Ms. Brock's methodology unreliable but rather go to the weight that the trier of fact may place on Ms. Brock's testimony.

Knudsen also argues that Ms. Brock's application of her methodology to the case at bar is unreliable. (Doc. 159, p. 5). Specifically, Knudsen argues that she did not "carefully consider" various facts and arguments in making her opinions like whether or not Harris will need around-the-clock care in determining his expected life-expectancy or whether she contacted enough "sitter services" or "care facilities" in calculating an average price for those services. (Id., pp. 5-8). Like with Mr. Webster's testimony, this court finds that these arguments concern the weight of the evidence rather than the reliability of the expert's application of her methodology. Therefore, Knudsen's concerns are subject to cross-examination but are not grounds for excluding Mr. Webster's testimony.

## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is hereby **ORDERED** that Knudsen's Motion to Exclude the Expert Testimony of Geoffrey Webster (Doc. 158) and Knudsen's Motion to Exclude the Expert Testimony of Catherine Brock

(Doc. 159) are **DENIED**.

    **DONE and ORDERED** this 17th day of May, 2010.

    /s/ Callie V. S. Granade
    UNITED STATES DISTRICT JUDGE